[Civ. No. 14335.   Second Dist., Div. Three.   Sept. 21, 1944.]

P. B. SHONAFELT et al., Respondents, v. ALICE M. BUSATH et al., Appellants.

Don Lake for Appellants.

Benedict, Bowman & Stewart for Respondents.

DESMOND, P. J.—Defendants, Mrs. Busath and her daughter, have appealed from a judgment entered in an action for an injunction and to quiet title, by which they were ordered to remove a fence which they had built longitudinally upon a concrete sidewalk constructed several years previously by plaintiffs and over which plaintiffs claimed an easement of right of way by prescription. Defendants denied that plaintiffs had such easement, and by way of cross-complaint alleged that they were the owners of the property involved and prayed that their title be quieted as against plaintiffs. In answer to the cross-complaint, plaintiffs, in addition to setting up the easement of right of way, alleged that they were the owners of an easement for the purpose of permitting the eaves of their house and the rafters supporting the eaves to extend over and above defendants' property and for eaves-drip. The court, sitting without a jury, found that plaintiffs were the owners of the easements and rendered judgment in their favor, forever restraining and enjoining the defendants from obstructing or destroying them, or interfering with plaintiffs in their use thereof and requiring them to remove the fence and all obstructions from the easement of right of way.

Plaintiffs, husband and wife, own Lot 35, Block H, Tract 3368, in the city of Avalon, Catalina Island, California, and defendants are the owners of an adjoining lot, being Lot 34. Both lots front on Sumner Street and extend from that street to an alley at the rear of both properties. The lots in Avalon, a resort city, are narrow ones and "so close together that

people run between the houses anywhere and everywhere," according to Mrs. Busath's testimony. She also stated that the frontage of plaintiffs' lot (hereinafter referred to as the Shonafelt lot) is "19 feet plus," and of her lot (hereinafter referred to as the Busath lot) is "over 22 feet, 22 feet and one tenth." While the Busath lot has but one house on it, which extends from Sumner Street to the rear alley, the Shonafelt lot has two houses, one fronting upon Sumner Street, and the other abutting upon the alley in the rear. The distance between the Busath house and the Shonafelt front house is approximately 50 inches, except at a place where a projection on the Busath house narrows the distance by about a foot. In this area the plaintiffs constructed a concrete sidewalk, measuring approximately 32 inches in width from the side of the front Shonafelt house and maintaining approximately that same width to a point where the rear house is located. On June 20, 1938, defendants erected a fence upon this sidewalk running along the approximate center thereof and leaving a passageway next to the front Shonafelt house of approximately one foot, with a variance of perhaps one inch at the rear. The construction of this fence, leaving a clear space next to the front Shonafelt house of not more than a foot, effectively prevented the use by plaintiffs of the sidewalk. It was stipulated between counsel at the trial that the fence was within one-half inch of the boundary line between the two lots, and the sole issue before the trial court was whether plaintiffs had acquired an easement by prescription.

Defendants contend on appeal that plaintiffs acquired no such easements over their land because "no adverse control or use is shown. Nor is it shown that any adverse claim was ever communicated to defendants."

In finding that the plaintiffs were the "owners" of the easements, the trial court, in effect, found that plaintiffs had acquired title to said easements by prescription and as a necessary consequence found against defendants upon their claims. It was held in *Costello* v. *Sharp* (1924), 65 Cal.App. 152, 156-7 [223 P. 567], that in order "to establish an easement in the lands of another by prescription, . . . all the elements necessary to acquire title by adverse possession must be shown to exist. It must, therefore, be made clearly to appear that

the party claiming the easement has been, for the statutory period of five years (sec. 318, Code Civ. Proc.), in actual occupation or possession and use of the easement, and held such possession openly, continuously and notoriously, not clandestinely; that it has been held hostile to the title of the owner of the land in which the easement is asserted, and under a claim of title, exclusive of any other right, as one's own. (*Thomas* v. *England,* 71 Cal. 456 [12 P. 491]; *Clarke* v. *Clarke,* 133 Cal. 667 [66 P. 10]; *Pyramid Land etc. Co.* v. *Scott,* 51 Cal.App. 634, 646 [197 P. 398]; *Ricioli* v. *Lynch et al., ante,* p. 53 [223 P. 88].) And upon the party claiming the easement by prescriptive title rests the burden to clearly prove by competent evidence all the elements essential to the establishment of such title. [Cases.] On the other hand, when the plaintiff, claiming the easement by adverse user, has made a *prima facie* showing of a prescriptive title to the easement, then it is incumbent upon the defendant, by sufficient affirmative proof, to show that the use has been by virtue of a license or permission, or any other defense which would destroy the *prima facie* showing of title made by the plaintiff. (*Fleming* v. *Howard,* 150 Cal. 28, 30 [87 P. 908]; Washburn on Easements, 4th ed., p. 156; 14 Cyc. of L. & P. 1147; *Kripp* v. *Curtis,* 71 Cal. 66 [11 P. 361]; *Franz* v. *Mendonca,* 131 Cal. 209 [63 P. 361]; *Guernsey* v. *Antelope Creek etc. W. Co.,* 6 Cal.App. 387 [92 P. 326]; *Yuba Cons. Goldfields* v. *Hilton,* 16 Cal.App. 229 [116 P. 712, 715]; *Thomas* v. *England,* 71 Cal. 457 [12 P. 491]; *Ricioli* v. *Lynch et al., supra.*) And, upon a *prima facie* showing of title by the plaintiff, it is solely the province of the trial court to determine whether the same has or has not been overcome or dispelled by evidence presented by the defendant." It is urged by appellants that the burden is upon the plaintiffs to prove title by prescription, but the question on appeal, as was stated in *Alper* v. *Tormey* (1907), 7 Cal. App. 8, 11 [93 P. 402], is not "who has the burden of proof, or whether the issue has been established by a preponderance of the evidence, but . . . whether there is *any* evidence to support the finding of the trial court." (See, also, *Crawford* v. *Lambert* (1934), 136 Cal.App. 617, 621 [29 P.2d 428].)

We are of the opinion that all elements necessary to acquire title by adverse possession were shown to have existed

by the evidence adduced at the trial, hereinafter substantially set forth, and the presumptions deducible therefrom; furthermore, that the evidence supports the findings and judgment.

Plaintiffs' predecessors in title, a Mr. and Mrs. Wilkinson, built the first house on the Shonafelt property in 1911 or 1912. As part of the house construction, a boardwalk on 2 x 4s was constructed on a passageway between the Shonafelt and Busath house. This boardwalk extended from the front of the Shonafelt house to a platform in the rear of the house. In 1918 or 1919 the rear house was built on the Shonafelt property. The Busaths purchased their property in 1928, and the Shonafelts purchased theirs from the Wilkinsons in 1930. In 1934 or 1935 the Shonafelts removed the boardwalk and put in the concrete walk, which we have heretofore mentioned, and which, according to the evidence, did not "extend over any farther towards the Busath property . . . than the wooden walk. . . ."

Mrs. Hazel Wilkinson Otto, daughter of plaintiffs' predecessors in title, a witness for plaintiffs, stated that when the first house was constructed the boardwalk was built as part of the house and extended from the front "clear back to the rear of the house. Sometime during those early years we built a complete platform back of the house. At first there was just the walk back there. I don't think we put the platform in right at the beginning; I would not be positive about that, but it went back and joined with the platform built out there, and then at a still later date the rear house was built. . . . Q. . . . when you speak of the platform, that was a little raised place? A. Yes, a boarded-over place, so when we came around the back of the house to enter the house, that was our access to the back of the house, and our only access without going through the house, and we built that so as to do away with the dirt. Q. You would come around the walk and step on this platform? A. Yes. . . . Q. Do you recall approximately how far the board walk was . . . from the Shonafelt house? A. No, the board walk was moved over. . . . Originally we were not able to buy our property, but leased it, and then when Wrigley took over the Island we had to buy our property [in 1919], and at that time they took off from our lot either 4 or 6 inches, and gave us 19 feet and 8 inches or 19 feet and 6 inches, rather than the 20 feet, and at that time

there was a wooden stick put in, which so far as we knew was the new established corner, and the Busath house was at that time owned by personal friends of ours, and we wanted to buy that extra six inches back, but they felt they would rather keep it, so that we moved our walk over, and it was entirely on our property as far as we knew at that time. . . . Q. That would be the date you moved the walk over? A. Yes. Q. You did not cut anything off the walk? A. No, we just moved it.'' The witness then stated there was a shower at the rear of the house and that the passageway between the houses was used by the occupants of the Shonafelt house in going to and from the shower; ''we never went through the house in wet bathing suits.'' With regard to the rear house, the witness stated that it was built one-half for a shed and the other half for a maid's room; that the passageway was also used by the maid in going back and forth; that they ''used that passageway . . . from 1912 or 1913 continuously up until the house was sold to the Shonafelts''; that no one ever objected to their use of the passageway; ''there was really never any question about it; it was part of our place, supposedly, and it was so used. Q. Is there any other way to get into your property, the rear of your property, other than through the front door or down that side we are talking about. A. We used the side entrance down this walk. Q. The one we are having the trouble about? A. Yes. Q. But other than that and the front door? A. No, there was no other portion used. It might have been possible to get through the other side, but it was not practicable, because we put the shower so that we came down this one side and came across the platform. There was an entrance from the outside of the house to the shower, and the maid used the same thing.'' On cross-examination this witness was asked whether the alley way was used as an entrance to the maid's room on the back of the lot, and answered, ''I would not say that the maid or any member of the family in 25 or 30 years never walked in the alley, because they probably did, but the definite entrance was down the side of the house to the back, because the porch was built in there, and the whole set-up was on that basis. You would come right up Sumner and turn in.'' When shown a photograph of the present sidewalk and passageway (Plaintiffs' Exhibit 2), the witness stated that the boardwalk was ''substantially the width of the sidewalk.'' An inspection of this

photograph shows clearly the fence and barricade erected by the defendants and also indicates clearly the projection of the rafters and roof timbers of the Shonafelt house over the concrete sidewalk.

One of the defendants, Mrs. Alice M. Busath, called under section 2055, Code of Civil Procedure, testified as follows: "Q. Well, when they [plaintiffs] first started work on the sidewalk, did they run it from the front of their house back to where the old walk ended? A. A narrow strip, I don't believe it would reach way back there; I have no use for that side, so I don't go between there. I have no doors or any openings from my house out between there. Q. You say that they first put in a narrow walk? A. Yes. Q. And then they widened it? A. Yes. Q. How many times did they widen it? A. Lawsy! I don't know. A couple of times, I guess. Q. Do you remember how wide it was when they first put it in? A. Yes, it was pretty well up to my roof eaves. Q. Where did it start; at the edge of their house? A. Yes, just about. Q. And then when they kept adding onto it, they kept adding on over to your side? A. They certainly did, they made it run over towards my house so the drip from their house would run over my property. Q. Did you ever object to them doing that? . . . A. Silently, yes; never openly objected, no. I don't like trouble well enough. The Court: The question is, did you make any objection, and that means orally, or in writing. A. No, sir. Q. You did not say anything about it? A. No, I certainly didn't; I did not want any trouble with them. . . . Q. And they used this space between the houses to go to and from their premises? A. Yes, especially the Mister; he used it mostly. Q. Did he do that continuously from 1930 up until the time you put the fence in? A. Yes. Q. Did you ever object to him about doing that? A. No. . . . Q. Mrs. Shonafelt used to use that passageway to go back and forth? A. Sometimes, but later she did not need to. Q. You never objected to her using it? A. No, of course I didn't. . . . Q. . . . Then you never told the Shonafelts that you objected to their use of that passageway at any time? A. No, I didn't do such a thing at any time, and there is no use saying I did. . . . Q. You did not object to them putting in that side entrance, did you? A. I did not like it a bit, because I saw trouble ahead. The Court: The question is, Did you object

to it? Not openly, no, sir. . . ." When this witness appeared in her own defense, she was asked by the court: "Why did you erect that barricade that is there? A. Because there was so much infringement that I was afraid the time would come that I would be paying for property I could not own. . . ." Mrs. Busath offered no evidence whatsoever to show that the easements arose out of permission or neighborly accommodation; in fact, the contrary appears.

Mrs. M. Esther Shonafelt, one of the plaintiffs, testified to the continued use of the passageway in going and coming from their house from the time they purchased the property until the fence was built; that Mrs. Busath never objected to the use; that she rented the upper floor of her house during "the season" in addition to one room in the rear house; that her guests always used the passageway in going to and from the property and to and from the shower; that in 1934 or 1935 they removed the boardwalk and put in a concrete walk; that the concrete walk did not "extend over any farther towards the Busath property . . . than the wood walk"; that in 1935 they put in a side entrance into the front house, their purpose for doing so being that "our guests would have gone down out the front door and around the side of the house and into the shower, and we built the shower downstairs and one upstairs, and when we have an overflow we could come down and come out that side door and save them from going out on the street, and also coming up from the ocean they would first go to the shower and then upstairs. Q. It was to furnish an entranceway to the upstairs portion of the house, an outside entranceway? A. Yes; it was an accommodation. Q. Did the upstairs guests use that passageway and that side entrance up until the time the fence was built? A. Yes . . . whenever they came in." On cross-examination, the witness was asked, "During the period of time that you have owned the property, up until the time of the survey, where did you believe the property line to be? . . . A. I thought that corner stake, just exactly where the old board walk was and where the cement walk was, I did think that was our line. Q. . . . You believed the walk was entirely on your property? A. Yes, we did. Q. Had you known where the property line actually was, would you still maintain you had the right to use that walk? . . . A. Well, inasmuch as it had been used so many

years as access to that house, and that it was of no value to the other house—— THE COURT: Then the answer is 'Yes'? A. Yes, thank you, Judge. . . . Q. [By the COURT] Have you claimed the right to use that property where the sidewalk is since you have had the property? A. Yes, Judge, we have. THE COURT: Regardless of whose property it was on, you claimed the right to use it, did you? A. Yes, we did.''

■ Defendants urge that ''occupation by mistake with intent to hold to the true line is not adverse.'' With respect to land that is occupied by mistake, we find the rule set out in 1 California Jurisprudence 577, section 56: ''It is a general rule in California that title by adverse possession or prescription may be acquired, though the possession or use may have commenced under a mistake [footnote cases cited]. . . . In its final analysis the question is one rather of intention; and the intention, in turn, cannot be entirely disassociated from the claim of right.'' ■ Not only does the testimony clearly show that plaintiffs actually claimed the right to use the sidewalk and passageway in dispute regardless of whose property it was on, but their claim of right, in the absence of evidence, could have been inferred from their notorious acts in the use and improvement of the passageway. (See *Conaway* v. *Toogood* (1916), 172 Cal. 706, 710 [158 P. 200]; 1 Cal.Jur. 571, § 51.) The court stated in *Pacific Gas & E. Co.* v. *Crockett L. & C. Co.* (1924), 70 Cal.App. 283 [233 P. 370], ''The question as to whether the use was under claim of right is one for the court or jury to determine as a fact in the light of the relations between the parties and the surrounding circumstances, and where there is a conflict upon this subject the findings will of course not be disturbed here (*Wells* v. *Dias*, 57 Cal.App. 670 [207 P. 913]).''

■ Defendants argue further that ''possession of a previous holder cannot be tacked to the time of plaintiff's possession, where the claimed easement is not included in his conveyance.'' Parenthetically, we may state that the cases cited by defendants in support of this contention involved the question of adverse possession of the fee (an issue not involved in this controversy), and not that of an easement, which is an interest in the land of another, with only the right to use the land. ■ A similar contention to the effect that the claimants could not take advantage of a right of way

gained by their predecessors, where the right of way was not mentioned "in any of the various mesne conveyances through which the claimants trace their title," was made in the case of *Conaway* v. *Toogood, supra,* 172 Cal. 706, and overruled, the court saying, p. 712: ". . . the rule is well established in this state that an easement as a right of way is incident to the land and passes with it unless expressly excepted by the terms of the deed. (Civ. Code, secs. 1084, 1104; *Rubio Cañon etc. Assn.* v. *Everett,* 154 Cal. 29, 33 [96 P. 811]; see, also, *Kripp* v. *Curtis,* 71 Cal. 62, 66 [11 P. 879]; 14 Cyc. 1152.)"

■ Although the plaintiffs were entitled to avail themselves of the time during which these easements were used by their predecessors in interest, it was not necessary for them to do so because, in our opinion, the evidence sufficiently established that the passageway was used by them personally and by their tenants and guests from 1930 to 1938, more than the period required by statute, under a claim of right, and not by permission, the possession being open and notorious, exclusive and hostile.

■ Defendants contend that the "locations of these easements-by-judgments, are not so described in the judgment that they can be found upon the ground, or found by reference to any monuments described in any public record. Indeed, the judgment is so indefinite in that regard that it must necessarily be reversed." This contention is not well founded. The judgment provides that the plaintiffs are the owners of easements "which . . . consist of: (1) an easement of right of way for the purpose of passing over the same on foot freely at all times and for ingress to and egress from said property of plaintiffs and cross-defendants above described and for the maintenance of a walk upon and along said easement of right of way over that part of said Lot 34 immediately adjoining and contiguous to said Lot 35 contained within the boundaries of the cement sidewalk, which runs upon the common boundary between said Lots 34 and 35, and the prolongation of the side lines of said cement sidewalk toward the alley at the rear of said Lots 34 and 35 to the intersection thereof with the prolongation toward Lot 34 of the front face of the rear building on said Lot 35, said front face being the one furthest from said alley; and (2) an easement for the purpose of permitting the eaves of plaintiffs' and cross-defendants'

house on said Lot 35 and the rafters supporting said eaves to extend over and above said Lot 34 and for eaves-drip.'' While an easement of right of way must contain a description of the land which is to be subjected to the servitude with sufficient clearness to locate it, we believe the foregoing description fully answers the requirements of the present situation. (See *Pacific Gas & E. Co.* v. *Crockett L. & C. Co., supra,* 70 Cal.App. 283, 293.)

Judgment affirmed.

Shinn, J., and Wood (Parker), J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied November 16, 1944.