[Civ. No. 16478.   First Dist., Div. One.   Jan. 9, 1956.]

CALIFORNIA A. LINDSAY et al., Respondents, v. HAROLD G. KING et al., Appellants.

Lucas, Wyckoff & Miller for Appellants.

Rankin, Oneal, Luckhardt, Center & Hall, Marshall S. Hall, Carl L. Hubbell and W. R. Dunn for Respondents.

PETERS, P. J.—The plaintiffs, the owners of the Emery Ranch in Santa Cruz County, brought this action against the owners of the nearby Wright Ranch to establish their right to one-half of the flow of water from a certain spring located on the Wright Ranch, and to compel the defendant Agnes Cox, now Agnes Cox Wright, the present owner of the Wright Ranch, to remove certain improvements on the Wright Ranch that are alleged to interfere with plaintiffs' water rights. Defendant Agnes Cox cross-complained for declaratory relief, claiming that she owns all of the waters flowing from the spring in question. The trial court found that plaintiffs had become the owners by prescription of an easement appurtenant to their land consisting of one-half of the flow of the spring. Defendant and cross-complainant Agnes Cox (Wright) and defendants Harold G., Amy E., and O. C. King appeal from the judgment.

The law applicable to water right easements gained by prescription is reasonably clear. Section 801, subdivision 9, of the Civil Code recognizes that an easement appurtenant to a dominant estate may consist of the right to secure water from the servient estate. Section 1007 of the Civil Code recognizes that a title by prescription gained by five years' occupancy of a private owner's property right under the circumstances set forth in the Code of Civil Procedure is

a title good against the world. ▉ But possession alone is not sufficient to gain such a title. The possession must be adverse, and the record owner must either have actual knowledge of the claims of the adverse claimant, or, as this court said in *Wood* v. *Davidson*, 62 Cal.App.2d 885, 890 [145 P.2d 659] : ''. . . the possession must be so open, visible and notorious that it will raise a presumption of notice to him of the adverse claim.''

In *Shonafelt* v. *Busath*, 66 Cal.App.2d 5, 7 [151 P.2d 873], the court laid down the following rule which has been generally stated in many cases: ''. . . to establish an easement in the lands of another by prescription, . . . all the elements necessary to acquire title by adverse possession must be shown to exist. It must, therefore, be made clearly to appear that the party claiming the easement has been, for the statutory period of five years (Code Civ. Proc., § 318), in actual occupation or possession and use of the easement, and held such possession openly, continuously and notoriously, not clandestinely; that it has been held hostile to the title of the owner of the land in which the easement is asserted, and under a claim of title, exclusive of any other right, at one's own.''

Another frequently approved statement of the rule is to be found in *Myran* v. *Smith*, 117 Cal.App. 355, 362 [4 P.2d 219], where it was stated: ''. . . to acquire the right by prescription in the lands of another, the possession . . . must be open, hostile and continuous—'he must unfurl his flag on the land, and keep it flying, so that the owner may see, if he will, that an enemy has invaded his domains, and planted the standard of conquest.' ''

These principles are well settled and are not questioned by the parties to this appeal. The basic question with which we are here presented is whether the facts of the instant case do or do not sustain the findings that a title by prescription had been here acquired. This being a fact question we must examine the record to see whether there is any substantial evidence, or any reasonable inference from the evidence, that supports the challenged findings.

Agnes Cox (Wright) owns the Wright Ranch on which is located a spring, which has two outlets, about 15 feet apart. In about 1908 or 1909 the county of Santa Cruz installed a 40-gallon settling tank at the lower outlet of the spring to collect the water, and from there piped it about 4,000 feet along the old county road to a county-owned water tank located on the Sears Ranch. Most of this single pipe line

was exposed, and remained so until about the early 1930s when the line of the road along which the pipe ran was changed. In 1926 or 1927 the county constructed a piping system connecting the upper outlet of the spring to the settling tank. Before this use by the county started, the then owners of the Wright Ranch executed a lease of these waters to the county for a four-year period at $12 per year. The county records show but one payment under this lease, made in the amount of $12 on April 26, 1911. The county used the water for sprinkling county roads until 1933, when sprinkling was discontinued. The county tank on the Sears Ranch remained standing until 1942 when Pearl Sears Lake had it removed shortly after her father's death.

There was an overflow from the county road tank located on the Sears Ranch. In 1908 or 1909 Mr. Sears made an arrangement with the county and with the then owners of the Wright Ranch to run a pipe from the county tank about 100 feet to another tank on his ranch to carry this overflow. By oral agreement with the owners of the Wright Ranch, Mr. Sears paid them and their successors $24 a year for this privilege. Thus, the use of the water by the Sears interests was permissive. Mrs. Sears Lake, present owner of the Sears Ranch, has filed a written disclaimer of any legal right to the water.

In 1908 or 1909 when the settling tank was installed on the Wright Ranch and the pipe line to the county tank on the Sears Ranch constructed, Mr. Sears and a Mr. Emery. predecessor of the respondents, were close friends, neighbors, and county road bosses. After Mr. Sears had built his tank and pipe line on his ranch and entered into the arrangement above described with the then owners of the Wright Ranch, it was discovered by Sears that there was still an unused overflow which created a mud hole near the newly built Sears tank. Mr. Emery about this time, to carry this overflow. ran a pipe from the county tank to a well on his property located near the county road, and used this water on his property. He did not have the permission of the owners of the Wright Ranch to use this water. The pipe line constructed by Emery was apparently buried below the surface of the land. In 1926 or 1927 the piping system carrying the water from the county tank on the Sears Ranch and from the county tank to the Emery Ranch included two visible valves located underneath the county tank, one on the pipe line leading to the Sears Ranch and the other on the pipe line to the Emery

Ranch. At about this time Mr. Sears told the county official in charge of sprinkling the county roads not to touch the Emery valve, that "if you ever have occasion to shut the water off, shut my water off from my place, don't shut it off from my neighbor," Mr. Emery.

Thomas Lindsay bought the Emery Ranch in 1941. At that time a pipe ran from the Sears Ranch to a 6,000-gallon water tank on the Emery Ranch. There was a valve arrangement on the Sears property at the site of the old county tank by which the Emery Ranch, which was lower in elevation than the Sears Ranch, got water first. There was an automatic valve at the Emery tank that shut off the water when that tank was full. However, if the Sears Ranch did not receive their share of the water, upon complaint to Mr. Lindsay, the Emery Ranch valve would be shut and the water diverted to the Sears pipe line. As between the Sears and Emery ranches the relationship was one of mutual recognition of each other's rights and of cooperation. Thomas Lindsay sold the Emery Ranch to his brother, one of the respondents herein, in 1946.

After the county, in 1933, had quit using the water here involved, the Sears and Emery interests, jointly, maintained and repaired the pipe line from the spring on the Wright Ranch to the site of the old county tank on the Sears Ranch. This pipe line needed continued flushing and repair, and sand, at least annually, had to be removed from the settling tank at the spring. In 1942 the Sears and Emery interests jointly purchased 600 feet of 1¼-inch pipe and replaced the upper 600 feet of the old pipe line starting from the concrete settling box at the spring on the Wright Ranch. This work, and a great deal of the repair work, took place on the Wright Ranch.

The Emery Ranch never paid anyone for the use of the water, and, in fact, never knew that the Sears interests were paying the Wright Ranch for the water it was using until 1946. In that year the then Miss Cox sent a bill to Thomas Lindsay for the water he had used in 1945 on the Emery Ranch. This bill was ignored.

The evidence also shows that Mr. Emery, for many years felt and expressed the thought to several people that the Emery Ranch, by virtue of its continuous use of the water for many years, and by virtue of the costs of the repair and maintenance of the pipe lines, the greater portion of the cost of which was advanced by him, had a legal right to the water.

In 1946 Miss Cox sold a portion of the Wright Ranch to the Kings. In June of 1949 the Kings installed a catch basin just below the upper outlet of the spring and from it ran a 1-inch pipe down to the King Ranch. The overflow from this newly constructed catch basin was directed to the concrete catch basin used by respondents. Shortly after the King catch basin was installed, respondents' and the Sears tanks went dry. They immediately blew out the pipe line and cleaned out their catch basin, but the water did not flow as before.

The Lindsays' main source of water for domestic and agricultural purposes on their ranch is from the above-described system. They use and have used it not only for domestic purposes, but to irrigate their orchard of 4,000 young fruit trees and their vegetable garden, and to water their livestock, consisting of chickens, rabbits and a cow. They also use it as part of the spraying operation of the orchard and garden. Such use completely depletes the 6,000-gallon tank in a day, and it takes two days to refill it. In the fall of the year, if the parties are careful, there is just about enough water produced at the spring to take care of the needs of the Sears and Emery Ranches.

Upon this evidence the trial court found that plaintiffs and their predecessors as owners of the Emery Ranch, and the owners of the Sears Ranch for many years had used the entire flow of the spring in equal parts; that such use was necessary for the full use, benefit and enjoyment of the two properties inasmuch as during the period in question neither property had any other substantial source of supply; and that plaintiffs and their predecessors had used the water openly, notoriously, uninterruptedly and adversely; that the defendants had wrongfully diverted the water to the King Ranch. Based on these findings the court adjudged that plaintiffs were the owners of one-half the total flow from the spring, and enjoined defendants from interfering with the natural and undiminished flow of one-half of the waters of the spring, and ordered defendants to remove their diversionary pipes and catch basin. Defendants appeal.

The first contention of appellants is that the evidence, tested by the standards set forth in the cases already referred to, does not show that the use by respondents was adverse, it being claimed that the evidence shows that the use by respondents was, at all times, subordinate to the use by the Sears, who were paying for the water and using it by per-

mission of the owner. If this were true, of course, the use by respondents would not have been adverse to appellants. But this is not the only interpretation of the evidence. Undoubtedly when Mr. Emery first constructed the pipe to his farm from the county tank and first began to use the water, such use was subordinate to that of Sears and not adverse to appellants. But that condition did not continue. By 1926 or 1927 Sears and Emery were respecting mutual rights in each other to the flow. In fact, Sears, in 1927, told the county officials in charge of sprinkling the county roads, that if water was short to turn off his valve and not to touch the Emery valve. By the time Thomas Lindsay took over the Emery Ranch in 1941 the setup was such that Lindsay's tank would be filled before that of Sears. There is no evidence that, at least after 1926, the Emery interests ever recognized a superior interest in Sears or in the Wright Ranch to the water. In fact, after that date the Emery interests clearly treated the water as if it was their own. That is the basic test of adverseness. (4 Tiffany, Real Property (3d ed.), p. 424 et seq.) The finding that the use has been adverse can be supported by the declarations or acts of the claimant in connection with his possession. (4 Tiffany, Real Property (3d ed.), p. 428.) That type of evidence here supports the finding.

Appellants next argue that the respondents only took surplus water not needed by appellants, and urge that, under such circumstances, there has been no invasion of appellants' rights so as to create a title by prescription. ▆ There can be no doubt, of course, that acquisition of a title by prescription requires that there be an invasion of the rights of the owner of the servient estate, because, without such invasion, the owner of the servient estate has no cause of action, and so the statute of limitations never starts to run. (*City of Los Angeles* v. *City of Glendale*, 23 Cal.2d 68 [142 P.2d 289].) ▆ For that reason when an upper riparian has no present use for the water and allows it to go downstream where the surplus water is used by a lower owner or appropriator, the lower owner, as against the upper owner, gains no right by prescription. The rights of the upper owner have not been invaded by the use by the lower owner. The use by the lower claimant is not hostile to the rights of the upper owner. (*Orchard* v. *Cecil F. White Ranches, Inc.*, 97 Cal.App.2d 35 [217 P.2d 143]; *City of Pasadena* v. *City of Alhambra,* 33 Cal.2d 908 [207 P.2d 17]; *Alpaugh Irr. Dist.* v. *County of Kern,* 113 Cal.App.2d 286 [248 P.2d

117]; *Stevens* v. *Oakdale Irr. Dist.,* 13 Cal.2d 343 [90 P.2d 58]; *Dannenbrink* v. *Burger,* 23 Cal.App. 587 [138 P. 751]; *Bathgate* v. *Irvine,* 126 Cal. 135 [58 P. 442, 77 Am.St.Rep. 158].) But these are all cases where the upper owner had no need for the water, allowed it to go downstream, and the lower claimant diverted the water after it had left the lands of the upper owner. Of course, in such a case, the lower use is not hostile to the upper owner's rights. ■ But the rule that prescription does not run upstream has no application to a case where, as here, the lower owner directly diverts from the upper owner's lands. While the water here used by respondents was, as to appellants, surplus water, the diversion here took place at the spring located on appellants' land. Thus, respondents did not merely take the corpus of the surplus water, but respondents took the water right itself. This was an appropriation of the water right, and a hostile present invasion of appellants' rights. (*Wood* v. *Davidson,* 62 Cal.App.2d 885 [149 P.2d 659].)

In apparent recognition of this rule appellants argue that the actual diversion by respondents took place at the county tank on the Sears Ranch, downstream from appellants, and did not take place at the spring on the Wright Ranch. Therefore, say appellants, the general rule applies.

It can perhaps be said that the evidence would support a finding that respondents' diversion did take place at the county tank located on the Sears Ranch. But that is not the only interpretation of the evidence. We must, of course, interpret the evidence most strongly in favor of respondents, must give them the benefit of all substantial evidence and every reasonable inference based thereon. (*Mattoon* v. *Steiff,* 123 Cal.App.2d 512 [266 P.2d 920]; *Estate of Bristol,* 23 Cal.2d 221 [143 P.2d 689].) ■ The evidence already set forth is capable of the interpretation that at least since 1933, when the county abandoned its use of the water, respondents claimed an interest in the pipe line from the spring on the Wright Ranch to the county tank and exercised the rights of a partial owner over it. While the county installed the original pipe from the spring by which the water was diverted, about 1933 they abandoned that diversion. The appellants had knowledge of this fact. Thereafter, the Emery and Sears interests jointly repaired and maintained this pipe line, and, on one occasion, replaced 600 feet of it. This exercise of dominion and control, coupled with a claim or interest in the pipe line, are sufficient to sustain the finding that

respondents owned a one-half interest in the pipe line right up to the spring. Thus, the evidence supports the finding that the diversion took place on the Wright property.

The really difficult question in this case is whether there is any substantial evidence that the diversion took place under circumstances that the Wright interests are chargeable with actual or constructive knowledge of it. As stated by this court in *Wood* v. *Davidson,* 62 Cal.App.2d 885, 890 [145 P.2d 659]: "The rule approved by all of the authorities is that either the record owner must have actual knowledge or the possession must be so open, visible and notorious that it will raise a presumption of notice to him of the adverse claim. . . . Open, notorious and visible possession is the equivalent of actual knowledge." (See also *Hails* v. *Martz,* 28 Cal.2d 775 [172 P.2d 52].) In the instant case the pipe line from the spring to the county tank was open and visible until 1933, when it was partially covered when the old county road was rebuilt. The settling tank at the spring was above ground and easily visible. But the pipe line, although visible, ran to the Sears Ranch to whom appellants had orally leased a water right. The pipe line from the county tank to respondents' property was not only underground but was not on appellants' property. Thus, it is argued, these acts did not serve to make the possession open, visible and notorious. (*Powers* v. *Perry,* 12 Cal.App. 77 [106 P. 595].)

But over the years the Emery interests, together with the Sears interests, made open entry on the Wright Ranch to repair, flush out, maintain and even replace the pipe from the spring to the county tank. Appellants argue this was not notice to them that Emery claimed an interest in the pipe line because they were entitled to believe these acts were being done by Sears to protect his oral lease of the waters. While the evidence is capable of that interpretation, such interpretation is not the only one that can be drawn, reasonably, from the facts. It can reasonably be argued that from these facts appellants were put on inquiry as to Emery's claims to the water. It is also a reasonable argument that appellants are chargeable with knowledge of how much water they had and how much their lessee Sears was using. The slightest inquiry would have developed the fact that Sears claimed, under his oral agreement with appellants, only the right to one-half of the water, and that respondents claimed the other one-half.

There is also some slight evidence of actual notice in the

present case. The Wright Ranch was acquired by the appellant Agnes Cox (Wright) in December of 1941. Shortly thereafter she admitted that her neighbors told her that the Lindsays were taking water. She also testified that she knew the water in the Sears tank came from her ranch, but she believed that the Emery water was merely overflow from the Sears tank. W. Q. Wright, who owned the Wright Ranch from 1911 to about 1934, admitted that he, too, knew that a pipe went from the tank on the Sears Ranch to the Emery Ranch, but he, too, believed it carried overflow from the Sears tank. Agnes Cox (Wright) also testified that in 1943 she visited the Emery Ranch and met Tom Lindsay who referred her to his wife; that Mrs. Lindsay told her they were getting their water from the Sears Ranch; that since she was getting paid for the Sears water she did nothing more. Tom Lindsay testified that he did not remember such a conversation and that he had never discussed the water situation with Agnes Cox (Wright) prior to the time she billed them for the water.

Agnes Cox (Wright) also testified that about July 13, 1945, she received a letter from respondents' attorney notifying her of their claim; that about January 31, 1946, she sent respondents a bill for $24 for respondents' use of the water for the year 1945, and that this bill was ignored and never paid. She did nothing to stop respondents' use of the water until respondents filed this action on July 29, 1949, whereupon she, on September 7, 1949, filed her answer and cross-complaint.

Although this evidence is not as clear or as positive as might be desired, in our opinion it is some evidence to support the finding that appellants had actual knowledge of respondents' claim, but even if they did not, the evidence certainly shows that they had notice of enough facts to place upon them a duty of inquiry, which, had it been followed, would have disclosed the facts. ▇ Notice is a question of fact. (*O'Banion* v. *Borba*, 32 Cal.2d 145 [195 P.2d 10].) The finding of notice is supported.

The possession here was clearly continuous and uninterrupted. This is not seriously challenged by appellants. But appellants do claim that here there was not the required exclusiveness of use. Admittedly, at no time have respondents claimed all the water, sharing the water with the Sears Ranch. ▇ But exclusive user of the entire water right is not required to perfect a prescriptive title, as long as the claimant

claims the exclusive right to a definite quantity of water. (*O'Banion* v. *Borba*, 32 Cal.2d 145 [195 P.2d 10]; *Silva* v. *Hawn*, 10 Cal.App. 544 [102 P. 952]; see also 4 Tiffany on Real Property (3d ed.), p. 573.)

The appellants also urge that the trial court applied the wrong theory in weighing the evidence. This contention is based upon one statement made by the trial judge at page 108 of the 270-page transcript. That statement was to the effect that "prescription is based upon hostility, and hostility can be inferred from the openness of acts that puts people on their inquiry, and, as I have earlier stated, there is a presumption from usage." It was probably inaccurate to state, in effect, that because a use has been open and notorious a presumption of hostility and therefore adverse use arises. Probably the correct statement is that this is only another phase of the sufficiency of evidence in the light of all the circumstances. (*O'Banion* v. *Borba*, 32 Cal.2d 145, 149 [195 P.2d 10]; *People* v. *Sayig*, 101 Cal.App.2d 890, 897 [226 P.2d 702].) But the statement by the court was not, under the facts, even if erroneous, prejudicial. The evidence shows that respondents claimed in hostility to the claims of the Wright Ranch. The evidence shows an adverse use. There is not one word of evidence that respondents' use was permissive so far as the Wright Ranch is concerned, or that the Emery Ranch ever recognized a paramount right in the Wright Ranch. Therefore, the apparent mistaken reference to a presumption could not have been prejudicial.

Clearly without merit is the contention that the adverse nature of the use was concealed by the Lindsays because Agnes Cox (Wright) testified that Mrs. Lindsay had told her that the Emery Ranch water was secured from the Sears Ranch. Mr. Lindsay could not recall any such conversation in which he is supposed to have referred Miss Cox to his wife. The trial court could have concluded that no such conversation took place.

Appellants next urge that the respondents failed to establish any definite amount of water beneficially used for the prescriptive period. Appellants seem to believe that there can be no prescriptive right unless the quantity of the user is fixed by a definite, unvarying quantitative amount.

While the extent of the user must be shown by the one claiming an adverse use (*Crane* v. *J. J. Stevinson, Inc.*, 5 Cal.2d 387 [54 P.2d 1100]; *Strong* v. *Baldwin*, 137 Cal. 432 [70 P. 288]; *Beyl* v. *Yasukochi*, 135 Cal.App.2d 638

[287 ·P.2d 863]), the nature of the proof of user varies according to the circumstances. ■ The evidence here shows that the spring was the only source of water used by the Emery Ranch for domestic and agricultural uses for many years; that the water was diverted from the spring through one or 1¼-inch pipe; that the available water was shared equally by the Sears Ranch and the Emery Ranch, who also shared the cost of maintenance and upkeep. This is sufficient to show a definite beneficial use. It is the beneficial use of all the water from the spring that could flow through a one or 1¼-inch pipe.

■ Appellants urge that the diversion to the King Ranch does not injure the respondents sufficiently to warrant an injunction. The Kings, with the consent of the Wright Ranch, constructed a settling tank between the upper and lower outlets of the spring. There is evidence that immediately thereafter the Sears and Emery tanks went dry. There is also evidence that in the summer and fall the Sears and Emery Ranches use beneficially the full flow of the spring. This is sufficient evidence to show a present and future invasion of respondents' rights to warrant an injunction.

The appellants' last objection is to the finding that the only right of appellants to the water was through the disclaimer of Pearl Sears Lake "and is limited to that said one-half of the waters used as aforesaid by the Sears (Lake) ranch and is without right as to any part of the other one-half of the total flow of said spring and its sources." This finding cannot possibly prejudice appellants. It does not affect any rights between appellants and respondents.

There is one respect in which the judgment is not complete. Respondents, legally, are limited to the quantity of water that they have diverted in the past. That diversion has two limitations upon it—(1) not to exceed one-half of the water from the spring, and (2) the size of the existing diversion pipes. The judgment so provides. But it does not fix the dimensions of the diversion pipes which run a distance of nearly 4,000 feet. In order to prevent any misunderstanding in the future the size of these pipes should be fixed accurately. Thus the judgment is correct in all respects, but should also contain this limitation. For that reason alone the judgment is reversed with instructions to the trial court to ascertain and determine the size of the diversion pipes and to amend its findings, conclusions and judgment accord-

ingly. In all other respects the judgment is affirmed. In the interests of justice respondent should recover costs on this appeal.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied February 8, 1956, and the opinion and judgment were modified to read as printed above.