39 Cal.Rptr. 776]

[Civ. No. 10790. Third Dist. July 31, 1964.]

MARGIE W. CLEARY, Plaintiff and Appellant, v. ELMER TRIMBLE et al., Defendants and Respondents.

C. Ray Robinson, John E. Whiting and Mary C. Fisher for Plaintiff and Appellant.

William H. Dick, Kroloff, Brown, Belcher & Smart and Nat Brown, Jr., for Defendants and Respondents.

PIERCE, P. J.—The controversy concerns an easement claimed by respondents Trimble to a 10-foot-wide dirt road 1,600 feet in length which meanders snakelike along the section line common to Sections 2 and 3, Township 1 South, Range 9 East, M. D. B. & M., extending southerly from an eastwest county road (Carter Road) and into respondents' property in Sections 2 and 3 (S½ of NW¼ of 2; S½ of NE¼ of 3). The trial court upheld the Trimbles' claim finding that they had an easement (1) by prescription and (2) by map dedication.

Appellant Margie W. Cleary is the owner of the servient tenement. She owns 95 acres in Section 2 and 72 acres in Section 3. The Trimble lands, also in Sections 2 and 3, adjoin on the south. The road intersects the Cleary property. Substantial evidence, contrary to Mrs. Cleary's contention on appeal, supports the finding of a prescriptive easement. No determination of the issue of easement by dedication is necessary.

The road has existed at least since 1887. George Matesech, a witness called by the Trimbles, testified that at that time and for 10 years thereafter he and his brother and sister had used the road as a means of reaching the Wheatland School located across the road's intersection with Carter Road from their home across the railroad tracks to the south. Use of the road by these school children could have been permissive and is not significant. But he also testified that at that time Pete Dorland owned the lands (the dominant estate) now owned by the Trimbles (sometimes referred to by the witnesses as the "Dorland place," sometimes as the "southern ranch"— we will use these terms interchangeably). Dorland had his residence thereon and used the road as the sole means of ingress and egress between the house and the county road.

(This house remained on the property until the late 1940's when it burned. It was then 80 years old. All that remains now is a windmill.) Before Dorland, Manchester had owned the ranch. An earlier owner was Smith but he had used as an access road one extending to a county road on the south. During the period Matesech was acquainted with the road (1887-the 1920's), it was a "good gravel road."

In the middle and late 1920's, the Dorland place was occupied by one Rampoli who operated a flourishing bootlegging establishment. It was kept "pretty busy." He and his patrons used the road.

Matesech testified his "brother had the place rented, I think, for seven years." He also stated the brother had lived in the house, "farmed the ranch and he used that road back and forth, hauled his grain in and out, running back and forth three or four times a day. I used to go over to see him, I used to use the road pretty near every day off and on." Although the dates of the Matesech tenure were not given, it seems probable this was in or before the 1920's.

Matesech testified that other people used the road. Regarding the continuity of its use this witness testified: "Q. Now, to your knowledge was that road used for years from the time you're mentioning as a means of getting into the southern ranch? A. Absolutely, the road's been used for years and years. Q. Since the time you are telling us about? A. Yes. Q. Since 1887? A. Yes, it's been used, we used to go to school there for ten years."

No evidence was produced to show that use of the road was ever denied anyone (until the events precipitating this lawsuit). Matesech was asked: "Q. Anybody ever try to deny anybody the use of that road? A. No, no, it was free for anybody to use. Q. And has it ever been any different than that within all the period of time we're talking about? A. No, no difference at all."

Another witness for the Trimbles was Wilbur Morrill. He had been familiar with the use of the road since 1918 when at age 16 he had gone to work in the area. (He had farmed there ever since.) He had once farmed the place now owned by appellant, Mrs. Cleary. (It then belonged to Mrs. Stephens.)

The most significant testimony in the record is the statement by this witness that at least as early as *1918 the road was fenced off on both sides, separating it from the Cleary (then Stephens) place.* He testified that Dorland was then using the road to get in and out of his place: "Q. And who

all used that road? A. Well, that would be awfully hard to say who did, as far as I'm concerned, because when I was there for two or three days at a stretch, why you'd see different people all the time up and down that road." This witness also testified: "Q. And was access during any of that period of time denied to anybody who wanted to go down by anyone? A. Not that I know of. I never heard of it. I farmed the property myself in 1940. I rented it from Mrs. Stephens on a share crop, and at that time I farmed both sides of the road." He testified further that *the road was fenced then. The fence was destroyed by fire in 1947*—a general conflagration in the area. It was never rebuilt.

Respondent Elmer Trimble testified: He had commenced in 1940 to make land purchases in the area, including in addition to the Dorland place the Trimble home ranch. Before that, however, he had, commencing in 1936, leased the Dorland place as well as other land in the vicinity. He also testified he had been familiar with the land since 1928 and knew two of his predecessors in ownership of the Dorland place, J. E. Madison and G. A. Ulrich, who had used the road. When Trimble acquired the southern ranch, the road was the only means of ingress and egress. After the old house burned down (1947) no one resided thereon but access by the road for equipment was necessary so that the property could be farmed. He further testified he had continued to use this road as the only available access until three years before the trial (which was held in June 1962), when another road was constructed by him connecting the Dorland place to Henry Road on the south. This latter road was described as being unsatisfactory for cattle trucks because of bad curves and low places which caused it to be unsafe after rains. He stated that during the entire period of use by him and his predecessors nobody had challenged the right of use until the incident to be related next.

Arthur Silva was a witness for Mrs. Cleary. He had bought the servient tenement from one Nelson and had sold it to Mrs. Cleary in 1959. He knew that the Trimbles were using the road. He had seen them using it many times. They used it for trucks to haul barley. He admitted he had never tried to deny them access. He had at one time, however, put a padlock on the gate to prevent his harvested barley from being stolen. The lock was on overnight. The next day it, or the chain, had been cut or broken. Later Elmer Trimble told him he had cut the chain. Silva put on another lock and gave

a key to a man to whom he had leased the stubble for cattle grazing. He did not know whether this lock had been removed. Trimble testified that except for the one incident described above use of the road by himself and his son had been uninterrupted and unchallenged.

Mrs. Cleary, when she bought the place in 1959, plowed up the road. At that time the road, although visible, was described as being two tracks with grass in the middle. When this was done Richard Trimble had had the road regraded and reestablished. An altercation occurred and Trimble stated to Mrs. Cleary that the road was "the right-of-way to that ranch and I don't think you own that road." This litigation apparently followed shortly thereafter.

The trial court found under the foregoing facts that the Trimbles had acquired an easement by prescription. ■ Although "prescription" in its broadest definition means the effect of lapse of time in the creation or extinguishment of property interest, whether corporeal or incorporeal, the word in common law and in California has been usually applied to the creation of incorporeal interests by lapse of time while the term "adverse possession" refers to the acquisition and extinguishment of corporeal interests. The one deals with an adverse right of *use*, the other with a title to the land itself by adverse *possession*. (Rest., Property, intro. note, Topic A, p. 2922; 2 Witkin, Summary of Cal. Law, Real Property, § 10, p. 870; *Thomas* v. *England,* 71 Cal. 456 [12 P. 491]; 6 Powell on Real Property, p. 758.) Since the objectives and elements of both adverse possession and prescription are the same, the foregoing analysis of the distinction between the two would be both tautological and precious except for another factor—a very important one in this case —namely, the quantum and type of evidence which logically and legally proves the stated elements in a given case. Evidence which establishes adverse *user* may, as we shall see, differ quite materially from that required to prove adverse possession. ■ In other words, the elements are the same but the proof of the elements can be materially different.

Whether adverse title to the land itself or to an easement thereover is involved, the objectives of the law are "protection of long established positions and relatively prompt termination of controversies." (Rest., Property, § 457, p. 2923.) ■ The elements necessary to be proved to establish either adverse possession or adverse user are: open and notorious user or possession, which is continuous and uninterrupted, hostile to the true owner, and under a claim of

right (2 Witkin, Summary of Cal. Law, Real Property, § 12, p. 871, *Id.*, § 190, p. 1028, and cases there cited), or as these elements are perhaps more nicely stated with respect to easements in the Restatement:

Section 457, page 2923: "An easement is created by such use of land, for the period of prescription, as would be privileged if an easement existed, provided the use is (a) adverse, and (b) for the period of prescription, continuous and uninterrupted."

Section 458, page 2924: "A use of land is adverse to the owner of an interest in land which is or may become possessory when it is (a) not made in subordination to him, and (b) wrongful, or may be made by him wrongful, as to him, and (c) open and notorious."

In *Thomas* v. *England* (1886), 71 Cal. 456, at pages 457-458 [12 P. 491], it is stated: "In former times, prescription implied a claim to an incorporeal hereditament arising from the same having been enjoyed for so long a time that there was no existing evidence as to the period when such user and enjoyment commenced.

"Its origin must have been at a time 'whereof the memory of man runneth not to the contrary.' "

There was a presumption artificially contrived of a lost grant but this artifice has been abandoned both under the modern common law and in California. (Craig, *Prescriptive Water Rights in California,* 42 Cal.L.Rev. 219, 220, note 4.)

Civil Code section 1007 has provided since 1872 that "Occupancy for the period prescribed by the Code of Civil Procedure as sufficient to bar any ['an' in 1872] action for the recovery of the property confers a title thereto, denominated a title by prescription, which is sufficient against all, ... "[1] The period prescribed by the Code of Civil Procedure is five years. (Code Civ. Proc., § 321.) ▮ Broad in its terms, Civil Code section 1007 has been held merely to fix the time in which a right of prescription may be acquired. It does not alter the elements requisite of proof before the prescriptive right attaches. (*Thomas* v. *England, supra,* 71 Cal. 456, 458, 459.)

Under the facts recited above, the existence of the road and its use as a necessary means of access to the Dorland or southern land would—assuming existence of the other

[1]The 1935 amendment excluding acquisition of interests in public lands by adverse use or possession is immaterial to this case.

elements—have been sufficient to have proved a prescriptive title even under the original ''presumption-of-lost deed'' concept, since the predecessors of the Trimbles had been enjoying use of the road for 50 years and more, a period ''whereof the memory of man runneth not to the contrary.''

But, argues appellant, the Trimbles have not sustained the burden which was theirs to establish the elements necessary to establish an easement by prescription; their use was presumptively permissive, no hostility was shown, no claim of right, and the use was not shown to have been continuous and uninterrupted. Also the Trimbles did not meet the requirement of Code of Civil Procedure section 325, by showing improvement and maintenance, or the paying of taxes. None of these arguments can be sustained. We answer them as follows:

■ Appellant's insistence to the contrary notwithstanding, where a fenced road has been used as a nécessary means of access to a residence and to farm property for many many years, there is no presumption that the use has been without claim of right or, as the Restatement expresses it, ''made in subordination to'' the true owner.[2]

■ The question of the presumption (or nonpresumption) of permissive use has had, as Justice Tobriner expresses it,[3] a ''troubled history.'' This history is related by the late Justice Carter in *O'Banion* v. *Borba*, 32 Cal.2d 145 [195 P.2d 10]. Cases are cited which hold that from a showing of open, continuous, notorious and peaceable use for the prescriptive period a presumption of use under an adverse claim of right arises (*O'Banion* v. *Borba, at* p. 149); but other cases had held that absent direct evidence of an adverse claim

---

[2]Selection of the phrase ''not made in subordination to'' the owner by the authors of the Restatement seems to have been a deliberate attempt to avoid use of ''hostile'' and ''claim of right.'' ''Hostility'' does not mean ''that the parties must have a dispute as to the title during the period,'' but that the claimants use must be ''adverse to the record owner 'unaccompanied by any recognition, express or inferable from the circumstances of the right in the latter.' '' (*Sorensen* v. *Costa*, 32 Cal.2d 453, 459 [196 P.2d 900], citing 4 Tiffany, Real Property (3d ed.) p. 425.) It is stated in the Restatement, *supra*, on pages 2925-2926: ''It is not necessary that a use . . . be made in the belief or under a claim that is legally justified . . . Thus, one who uses the land of another in defiance of the owner is none the less an adverse user though he admits his lack of legal justification in making the use.'' (See *Lord* v. *Sanchez*, 136 Cal.App.2d 704, 707 [289 P.2d 41].)

[3]In *LeDeit* v. *Ehlert*, 205 Cal.App.2d 154, 160 [22 Cal.Rptr. 747], hereinafter to be discussed.

of right, a presumption of permissive use is indulged. After this review the decision stated (on p. 149) :

" ... The preferable view is to treat the case the same as any other, that is, the issue is ordinarily one of fact, giving consideration to all the circumstances and the inferences that may be drawn therefrom. *The use may be such that the trier of fact is justified in inferring an adverse claim and user and imputing constructive knowledge thereof to the owner. There seems to be no apparent reason for discussing the matter from the standpoint of presumptions.*" (Italics supplied.)

This problem, the opinion added, was one primarily for the trial court with the function of a reviewing court being limited to the determination whether substantial evidence supported the trial court's decision.

In *Lindsay* v. *King,* 138 Cal.App.2d 333 [292 P.2d 23], where the prescriptive right to a share of water from the flow of a spring was involved and where defendant contended the use had been permissive, the court, per Justice Peters, held that substantial evidence supported an adverse user. The opinion states on page 340 : " [T]he Emery interests clearly treated the water as if it was their own. That is the basic test of adverseness. (4 Tiffany, Real Property (3d ed.) p. 424 et seq.) " Regarding the notorious character of the user, the court states (on p. 343) : "Although . . . [the] evidence is not as clear or as positive as might be desired, in our opinion . . . [there] is some evidence to support the finding that appellants had actual knowledge of respondents' claim, but even if they did not, the evidence certainly shows that they had notice of enough facts to place upon them a duty of inquiry, which, had it been followed, would have disclosed the facts. Notice is a question of fact. (*O'Banion* v. *Borba,* 32 Cal.2d 145 [195 P.2d 10].) . . . " Commenting on an instruction to the effect that there was a presumption from usage, the court observes (on p. 344) : "It was probably inaccurate to state, in effect, that because a use has been open and notorious a presumption of hostility and therefore adverse use arises. Probably the correct statement is that this is only another phase of the sufficiency of the evidence in the light of all the circumstances. (*O'Banion* v. *Borba,* 32 Cal.2d 145, 149 [195 P.2d 10] . . . ) But the statement by the court was not, under the facts, even if erroneous, prejudicial. . . . "

The court in, *LeDeit* v. *Ehlert,* 205 Cal.App.2d 154 [22 Cal.Rptr. 747], cited and quoted from *O'Banion, supra,* following *Lindsay, supra,* stated (on p. 162) that an instruction

on the existence of a presumption of adverse user did not constitute prejudice. In that case the court upheld a judgment establishing a prescriptive right to a road consisting "of a track" on open land, free of fences, its route following a creek. It had been used for recreation and hunting purposes. The appellate court referred to the following facts as supporting the trial court's holding: treatment by the claimants of the roadway as their own; repairs and maintenance; use over a period of 35 years at different times, seasons, days of the week; location of the road as a means of access to claimant's cabin; acts of dominion inconsistent with permissive user; and absence of any request for permission.

Many of these factors are present here. ■ In addition the fact that the road for many years had been fenced off separating it from the servient estate is, as stated above, most significant. (Appellant makes the point that it is not known *who* constructed the fences. This is unimportant. What is important is the recognition of a right implicit in the fact that the servient owner, or owners, permitted the physical severance of the road.) From the fact that the road was used for a period from before 1887 to 1947 (when the house burned)—a period of 60 years—as the sole means of access to a residence is strong proof that the use must have been known by the servient owners.

■ Appellant contends there is no proof the use was uninterrupted. The fact that over a span of half a century witnesses cannot be produced to describe observed use during each of the 60 years does not prevent inference that use of a road such as this one was uninterrupted, particularly when witnesses were produced whose testimony *did cover substantially* the whole period and who described an observed continuous use of this as an access road by the successive owners and tenants of the "southern ranch."

■ Citing Code of Civil Procedure section 325, relating to adverse possession of *land* requiring proof that land be "protected by a substantial inclosure," and "usually cultivated or improved," appellant contends that there was no proof here that the Trimbles or their predecessors maintained the road. It is doubtful whether the cited section which refers to "land" has any reference to an easement by prescription. (See *Frederick* v. *Dickey*, 91 Cal. 358, 360 [27 P. 742].) Certainly, there are many easements which in their very nature cannot be "protected by substantial inclosure," including some roads (see, e.g., *LeDeit* v. *Ehlert, supra,* 205

Cal.App.2d 154)—although for many years this road was fenced. As regards maintenance, it *was* shown that when Dorland made his home there the road was ''a good gravel road,'' and it has been at all times and seasons of the year serviceable to all successive owners of the dominant estate. Since it was fenced off, apparently for exclusive use by the owners of the dominant estate, it is to be assumed that they performed whatever road work was necessary No greater maintenance is required than that which keeps the road in condition for customary use. The road has been visible at all times. In this case it is not shown that the Trimbles or their predecessors ever asked or received permission to use the road. On the contrary, acts of dominion were exercised by the Trimbles during the prescriptive period. They cut Silva's padlocked chain and protested against its use.

 Appellant contends that the right must fail because there was no proof that taxes had been paid. Absent a showing that the easement was separately assessed, burden of proof of which is upon the owner of the servient estate, no such showing was necessary. (*Glatts* v. *Henson,* 31 Cal.2d 368, 372 [188 P.2d 745]; *Sufficool* v. *Duncan,* 187 Cal.App.2d 544, 549 [9 Cal.Rptr. 763].)

Appellant points out that one of the Trimbles was a tenant of Mrs. Cleary's predecessor and urges that a tenant while his tenancy exists cannot acquire a title by adverse possession. (Code Civ. Proc., § 326; *Conaway* v. *Toogood,* 172 Cal. 706 [158 P. 200].) But the evidence here justifies the court's holding that the completion of the prescriptive easement had antedated this tenancy by many years. A tenant because of his tenancy does not lose an easement previously acquired by his predecessor.

As an alternate ground of decision, on the authority of *Danielson* v. *Sykes,* 157 Cal. 686 [109 P. 87, 28 L.R.A.N.S. 1024], the trial court held that the Trimbles had a right to use the road under their deeds, which described the lands conveyed by reference to lots on a subdivision which lots front upon designated private roads.

Prior to the 1890's Mrs. Cleary's Section 2 land was owned by Sarah Peters and her Section 3 land by Stephens. Mrs. Peters' daughter Elizabeth married Stephens and Mrs. Peters deeded her lands to her daughter. All of the now Trimble property in the southern ranch then belonged to Skidmore. In 1912 Skidmore and Stephens recorded a subdivision map, ''Locke-Paddon addition to Trigo.'' It includ-

ed all of their property but not the land in Section 2 deeded by Mrs. Peters to Elizabeth. By this map the included land was divided into numbered lots and a "private road" extended from Carter Road on the north along the section line common to Sections 2 and 3. The road was stated to be 40 feet wide but only one-half, or 20 feet, thereof was within the subdivision. Each lot extended to the center line of the road. Thereafter, all deeds conveying land in Section 3 have described such land by reference to the lot numbers. This was true in the case of the deeds to the Trimbles. The *Danielson* case, *supra,* holds (to quote from the syllabus) "that when one lays out a tract of land into lots and streets, and sells the lots by reference to a map which exhibits them as they lie with relation to each other, the purchasers have a private easement, not only in the streets and ways abutting on their lots and leading therefrom to some public place or highway, but also in the streets and ways leading therefrom to other lots, and this private easement in such streets or ways is entirely independent of any dedication thereof to public use, but constitutes a private appurtenance to the lots so sold, . . ."

Under this rule, if applicable, the Trimbles would have an easement to all of that portion of the existing road which lies within the east 20 feet of Section 3—whatever that portion may be. (Any easement to portions of said east 20 feet lying within the Cleary ranch and *not occupied by the road*—which as stated above meanders snakelike between Sections 2 and 3—would have been, no doubt, long since lost by adverse possession.)

Appellant urges that the *Danielson* case rule should not be applied to a mere "straw" subdivision, one which never actually was laid out on the ground and there seems to be substance to the contention. However, the question has not been fully briefed, and it is clear from the record that insufficient consideration was given to the fact *that lands within Section 2 are not within the subdivision at all and therefore could not come within the Danielson rule.* Accordingly, we do not pass upon this question and we are not required to do so since the easement decreed by the court is limited to the road as it exists upon the ground (and not as it appears on the map) and this easement we have found to exist by prescription.

The judgment is affirmed.

Schottky, J., and Friedman, J., concurred.