[Civ. No. 23735.   Second Dist., Div. Two.   Dec. 7, 1959.]

GEORGE E. JONES et al., Respondents, v. CLOISEA
HARMON, Appellant.

P. E. Durkee for Appellant.

Lance D. Smith and Willard P. Netzley for Respondents.

HERNDON, J.—This is an action in which the seven plaintiffs sought to establish an easement across defendant's property for a pipeline by which irrigation water had been supplied to plaintiffs' property for some 30 years before the commencement of the litigation. Plaintiffs also sought injunctive relief directing defendant to remove an obstruction which she had placed in the pipeline and money damages for

the loss of crops, trees and vines resulting from defendant's interference with their irrigation water supply.

There was a judgment for plaintiffs in which defendant was enjoined from interfering with or obstructing the pipeline, the easement claimed by plaintiffs was declared to be established, and a total of $2,750 was awarded as money damages for loss of crops to three of the plaintiffs.

Defendant appeals, contending that the evidence is insufficient to sustain the findings that an easement exists in favor of plaintiffs across defendant's property. In the face of such a contention we must review the record according to the familiar rule (*Bazaure* v. *Richman,* 169 Cal.App.2d 218, 220 [336 P.2d 1014]; *Nichols* v. *Mitchell,* 32 Cal.2d 598, 600 [197 P.2d 550]), and construe the evidence most favorably to respondents. (*Marangi* v. *Domenici,* 161 Cal.App.2d 552, 553 [326 P.2d 527].)

## The Facts

Appellant, Cloisea Harmon, is the owner of three parcels of land known as 1406, 1408 and 1414 Virginia Avenue in Baldwin Park, California. About 20 inches below the surface of appellant's land is a 12-inch concrete irrigation pipeline constructed prior to 1927 when the entire area was undeveloped farmland. Appellant purchased part of her property in 1951 and the remainder in 1954. There was no reference to the pipelines or to any easement for their use in appellant's deed or policy of title insurance, nor was such an easement otherwise recorded.

Appellant testified that she was completely unaware of the existence of the irrigation pipe under her land when she purchased the property, and that she first learned of its existence in 1955 when water collected on her property from a leak in the line. At that time she contacted the manager of a local domestic and irrigation water company, Walnut Mutual Water Company Number 17, and learned from him that the leaking pipeline was part of the irrigation system of an informal, unincorporated association of adjacent landowners known as the Jones Well Water Company. She contacted the secretary of the Jones Well Water Company and received assurances that the pumping would stop until repairs were made. No such repairs were made in 1955, and in the summer of 1956 appellant's land was again flooded by the pumping operations of the Jones Well Company. Considerable acrimony developed between appellant and Rudolph Wilken,

the manager of the Jones Well Company, with respect to the flooding and the scope of the needed repairs. It appears that at least part of the disagreement between appellant and the representatives of the water company resulted from her insistence that the water company resurface her backyard with a blacktop compound. This Wilken refused to do. Whatever the origin of this neighborhood squabble, it is clear from the record that as late as June or July of 1956 Wilken, accompanied by the then chief of police of Baldwin Park, offered to repair the pipeline on behalf of the Jones well users. Appellant refused Wilken permission to enter on her land to make the repairs.

Thereafter, in June, 1957, appellant plugged the pipeline running under her land and stopped the flow of irrigation water to plaintiffs' land. On their respective properties, plaintiffs Jones, Hess and Vitali maintained substantial small vineyards, fruit trees and truck gardens, the water for which came from the Jones well. With the stoppage of the water, Wilken again requested permission of appellant to repair the pipeline and demanded that appellant remove the blockage in the line. Appellant refused both requests, and the instant action was commenced. It was a hot, dry summer and during the pendency of the proceedings plaintiffs Jones, Hess and Vitali lost most of their respective crops due to the loss of their usual source of water.

The date of the formation of the Jones Well Water Company is not established by the record, but apparently it was in existence before 1920. As we have noted, it was an informal mutual association of neighboring landowners. Its purpose was to supply irrigation water to its members. The source of the water was the Jones well, which was located a considerable distance to the northeast of the property now owned by appellant. Appellant's land lies between the well and plaintiffs' lots, which are located farther to the northwest.

There was an agreement between the owners of the land on which the Jones well was located and the other landowners that the latter and their successors would have the right to use the water from the well for irrigation purposes. For a considerable period of time the water was conveyed in open ditches, but during the 1920's subdivision of some of the tracts was undertaken and it apparently became increasingly necessary to take the water through underground conduits. Although the evidence is sketchy and vague, it fairly appears that the several participating landowners cooperated in de-

veloping the system and contributed to the maintenance and improvement of the ditches and conduits.

A Mrs. Couch testified that in 1913 she and her husband bought a tract of 10 acres which was one of the parcels later served by the Jones well. For a number of years the Couches devoted the land to farming, but sometime in the mid-20's they subdivided it into residential lots. Appellant's lots are among those which were carved out of the Couch tract. Prior to the subdivision of this tract, and probably about 1924, the Couches laid the section of the pipeline which is involved in the present controversy. Thus, it is to be observed that the pipeline here in question was actually constructed by predecessors-in-interest of the appellant. This change of the conduit from an open ditch to a pipeline was apparently dictated by changing conditions and by a desire to improve the efficiency of the distribution system.

The following excerpts from Mrs. Couch's testimony bear significantly upon the intent of the participating landowners with respect to the irrigation system and the nature of their rights therein: "Q. Did you have an interest in the Jones well? A. Well, the only interest we had is when we bought the property we were told we could always have water from that well and everyone in the district would have the same right. We have had water for about, anyway, 15 years or 16 years from that well. . . . Q. All of the property you sold off there, that ten acres and the subsequent ten acres you bought from Jewett, no place in any one of those sales or part of that subdivision was any easement granted to the transferee or the grantee? A. I don't remember that there was. It was just water had run there. We had it so many years. That was our right. Q. That was for your own particular use; is that right? A. That was for the land. Q. You did not grant that to anybody, did you? A. Yes, it went with the land just the same as we bought it. Q. Did any of your deeds say so? A. Perhaps not. . . . Q. As you sold as you eventually did, according to your subdivision map, there was no arrangement made with the people who you sold it to for any water rights from the Jones well, . . . ? A. No. We always used the water. It always had been available to us. It was considered a part—— Q. I don't know what it was considered. You made no specific grant or any arrangement with anybody you sold it to? A. I think not."

Rudolph Wilken, president and manager of the Jones Well

Water Company, testified that he had been connected with the company since about 1923 and had supervised the maintenance and repair of the ditches and conduits throughout the intervening years. He said that the land which included plaintiffs' lots was subdivided in about 1926 and that these lots had been supplied with water from the Jones well continuously from that date until the time when appellant obstructed the line. When asked about the ownership of the water company, Mr. Wilken said: "It is a community outfit, everybody that needs water. When you buy a piece of ground in there—never be any stock with that water company. You buy a piece of ground in there and the water goes with it. You don't buy no shares, no stock or what-have-you." He further testified: "Q. Who is the owner of the Jones Well? A. The users. Q. Who are they? A. Well, the well belongs to the land. Q. Who owns the land? A. Well, individuals. Each individual that owns a portion of the land has the water rights. Q. I am talking about the Jones Well now. The land where the Jones Well is, who owns that land? A. Well, as I said a little bit ago, that goes with the property owners."

One C. W. Wade testified that he had lived in the area and had been supplied irrigation water for his land by means of the Jones well for 24 years. Plaintiffs Jones, Hess and Vitali testified that they had received water from the Jones well from the time they had purchased their respective parcels.

The section of pipeline running under appellant's land is completely underground and thus could not be discovered solely from an examination of the surface of appellant's property. However, immediately adjacent to appellant's land there were certain visible installations characteristic of an irrigation system which were located in such alignment in relation to appellant's land as to indicate the probable course of the conduit thereunder. At the time appellant purchased her lot there was a standpipe on the neighboring yard about 50 feet from her property line which was plainly visible. This standpipe had been standing and visible since 1923 or 1924. On a direct line from the standpipe is a "weir-box," a device for measuring the flow of irrigation water (see Webster's New International Dictionary, 2d ed., p. 2900) which was also visible from appellant's land. This "weir-box" had been constructed about 1940.

From the facts hereinabove recited and the law now to be discussed, we conclude that the judgment must be affirmed.

## THE LAW

■ An easement is an interest in land which may be created by grant, express or implied, or by prescription. (See, generally, 17 Cal.Jur.2d 89, § 2; Burby, Real Property, 78, § 58 et seq.) ■ And an easement for a pipe or other similar enclosed conduit may be acquired by prescription. (See 3 Tiffany, Real Property, 222-225, § 767.) ■ The same general principles governing the acquisition of easements by prescription apply to the acquisition of the prescriptive right to the use of such underground conduits. (See Annotation: Easement by Prescription in Artificial Drains, Pipes, or Sewers, 55 A.L.R.2d 1144, 1167 et seq.) ■ To create such an easement the use must be "... continuous, uninterrupted, peaceable, adverse and under a claim of right, with notice of which ..." the servient estate may be charged. (*O'Banion* v. *Borba,* 32 Cal.2d 145, 150 [195 P.2d 10].)

■ Thus an actual, open, and notorious use of an underground conduit, hostile and adverse to the title of the person against whom the claim is made, under claim of right, continuous and uninterrupted for the statutory period of five years (Civ. Code, § 1007) will ripen into an easement by prescription. (*Adams* v. *Estate of Smith,* 88 Cal.App.2d 910 [199 P.2d 730]; *Hahn* v. *Curtis,* 73 Cal.App.2d 382, 389 [166 P.2d 611]; *Hails* v. *Martz,* 28 Cal.2d 775, 778 [172 P.2d 52]; see generally: Cook, *Legal Analysis in the Law of Prescriptive Easements,* 15 So.Cal.L.Rev. 44.)

■ As stated in *Lindsay* v. *King,* 138 Cal.App.2d 333, 340 [292 P.2d 23]: "There can be no doubt, of course, that acquisition of a title by prescription requires that there be an invasion of the rights of the owner of the servient estate, because, without such invasion, the owner of the servient estate has no cause of action, and so the statute of limitations never starts to run. (*City of Los Angeles* v. *City of Glendale,* 23 Cal.2d 68 [142 P.2d 289].)"

■ In the case at bar there was evidence that the pipeline in question was laid more than 30 years ago, and that it had been used continuously to supply irrigation water to plaintiffs' land. Moreover, there is evidence that the external signs of the irrigation system, including the standpipe and weir-box visible from appellant's land, were in place as far back as 1940 and earlier. ■ As stated in *O'Banion* v. *Borba, supra,* 32 Cal.2d 145, 147-148: "[W]hether the use of the easement is adverse and under a claim of right, or

permissive and with the owner's consent, and the nature of the user is sufficient to put the owner on notice, are questions of fact. (1 Cal.Jur. 635.) Also, if there is any substantial evidence to support the judgment, it must be affirmed. All conflicts must be resolved in favor of the prevailing party and the evidence viewed in a light most favorable to him.''

From the evidence which we have summarized above, it is clear that the findings of the trial court in the case at bar are well-supported. There is ample basis for inferences which supply every essential element of a title by prescription. It seems fairly evident that the general use of the ditches and conduits which made up the distribution system of the Jones Well Water Company had been open and notorious for more than 30 years prior to the trial of this action. A realistic view of the evidence leads to the conclusion that the existence, location, and use of the pipelines must have been known to every resident of the neighborhood.

Certainly the trial court was justified in finding that the landowner members of the Water Company at all times used both the water from the Jones well and the system by which it was conveyed *under a claim of right*. The record provides ample basis for the reasonable inference that the participating landowners at all times claimed and asserted the *right* to use this system. The testimony of Mrs. Couch, one of appellant's predecessors-in-interest, is sufficient in and of itself to support a finding that the right of each landowner to use the facilities of the system was regarded, not as being dependent upon anyone's permission and not as a matter of a mere revocable license, but as a matter of right. Supporting inferences may be drawn from the facts relating to the manner in which the pipelines were laid and maintained, and from the nature of the agreement between the owners of the land on which the Jones well was located and the predecessors-in-interest of the parties to this action.

Although respondents have not advanced the theory that the easement claimed by them was created by an implied grant, there is much in the record which is suggestive of that theory. The evidence strongly suggests the probability that all the landowners who participated in the development of this irrigation system, including the predecessors-in-interest of the parties to this action, at all times regarded the pipeline right-of-way across their respective lands as something permanent and nonrevocable, that is to say, as being in the nature of an easement as distinguished from a license.

In any event, it seems fairly clear that the user was at all times hostile and adverse in the sense that it was exercised under a claim of right.

*Adams* v. *Estate of Smith, supra*, 88 Cal.App.2d 910, deals with a factual situation in some respects quite similar to that of the case at bar. There the pipeline in question was underground with standpipes coming to the surface. It had been installed sometime prior to 1900 by defendants' predecessors in ownership. Admittedly, the pipeline encroached upon plaintiffs' property for as much as two feet in some places and five feet in others. The litigation arose when it was discovered by plaintiffs that the pipeline was located upon their property. They sued to quiet title. By answer and cross-complaint, defendants set up their right to an easement over and across plaintiffs' property for the pipeline asserting that they and their predecessors-in-interest for more than 40 years past had used the premises for said purpose openly and uninterruptedly and with the knowledge of the plaintiffs. Answering the cross-complaint, plaintiffs denied that the land had been so used under a claim of right and alleged that the use was permissive only.

The trial court found that defendants and their predecessors-in-interest had used said parcel of land for pipeline purposes for more than 40 years ''openly, continuously, uninterruptedly and adversely.'' In that case, as in the case at bar, it was contended on appeal that the evidence was insufficient to justify the finding as to the adverse character of the use which the defendants had made with respect to the parcel of land in question. In sustaining the findings of the trial court, Mr. Presiding Justice Shinn used the following language (at page 912): ''It is said that there was no evidence that defendants' use of the land was adverse, and that the court should have found the use to have been permissive, although there was no evidence that permission to make use of the parcel had ever been asked or given. Respondents concede that there was no direct assertion upon their part or that of their predecessors of the right to make use of the land and that the finding of the adverse nature of the use rests upon a presumption of adversity which, they say, was properly drawn from the circumstances in evidence. We think the respondents are clearly correct in their position. The rule which governs was stated in *Pacific Gas & Electric Co.* v. *Crockett Land & Cattle Co.*, 70 Cal.App. 283, 291 [233 P. 370], as follows: 'Accordingly, it has been held

in this state that where an open and uninterrupted use of an easement for a sufficient length of time to create the presumption of a grant is shown the law will presume the elements of hostile intent and that the use is adverse and under a claim of right [citations]. If the other party relies upon the fact that these acts were permissive or in the nature of a license, or merely given as a matter of accommodation, it is incumbent upon him to rebut the presumption of a nonappearing grant. Otherwise the presumption stands as sufficient proof and establishes the right [citations]. If there is any evidence which throws any light upon the question as to whether the occupancy was under a license or a claim of right it presents a question of fact, and a finding thereon is here conclusive [citations].' The several elements of the rule have been declared in many cases. [Citations.] . . ."

■ It is hornbook law that an easement or profit created by prescription is not within the scope of the recording statutes. (3 Tiffany, Real Property, 399, § 828, and see Ferrier, *The Recording Acts and Titles by Adverse Possession and Prescription*, 14 Cal.L.Rev. 287, 291-292; Burby, Real Property, 124-125, § 88.) Moreover, even if the appellant could claim the benefit of the recording statutes to defeat an easement by prescription (see *O'Banion* v. *Borba, supra,* 32 Cal.2d 145, 153), she could not prevail. ■ The evidence above recited is sufficient to support the trial court's express finding that defendant was charged with constructive notice of the existence of the pipeline when she purchased her property. In *Johnson* v. *Cella,* 122 Cal.App.2d 72, 74 [264 P.2d 98], the court observed: "In an action of this kind the subsequent grantee who claims protection as a bona fide purchaser is entitled to such protection unless it is established that he is chargeable with actual or constructive notice of the existence of the easement. (*Kenniff* v. *Caulfield, supra; Power* v. *Perry,* 12 Cal.App. 77 [106 P. 595].) 'Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact.' (Civ. Code, § 19.) He is bound to take notice of facts which a reasonable inspection of the land would disclose to him and to make further inquiry when something is visible that would suggest such a course to a prudent person, possessing ordinary faculties. (*Pollard* v. *Rebman,* 162 Cal. 633 [124 P. 235]; *Rubio Cañon etc. Assn.* v. *Everett, supra; Powers* v. *Perry, supra.*)"

In that case the defendants were charged with constructive notice of the existence of a pipeline running under the land by evidence that signs of an underground water system could be observed on the surface of the land at the time they purchased their property, and that it was possible to infer the pipes ran under their plot. As stated by the court, " '. . . the defendants had actual notice of facts and circumstances sufficient to put them on inquiry as to the said pipeline and rights of plaintiffs.' Such a finding, if supported by the evidence, is sufficient without a further statement of the facts that gave rise to notice."

In the case at bar the mere fact that the pipeline may have been completely underground would not compel a finding that the appellant should not reasonably have discovered the existence of the waterway when she purchased her lots. It is stated in 55 American Law Reports 2d 1144 (Annotation: Easement by Prescription in Artificial Drains, Pipes, or Sewers) at 1167, 1169: "Where the pipes or other conduits as to which easements have been claimed were buried underground and their presence was not physically apparent throughout the prescriptive period, the court have generally concluded that there was insufficient notoriety of the user to permit prescription to run against the servient estate. This result has often been reached where there was an absence of substantial evidence that the servient parties had any notice or information of the existence of the facility and its user. . . . However, circumstances have sometimes arisen such as to give even buried conduits notoriety adequate to base a prescriptive easement. This has usually occurred where, even though the pipes themselves were not apparent, there were accessory installations on the surface which were plainly apparent." (*Cf. Powers* v. *Perry,* 12 Cal.App. 77, 82-83 [106 P. 595]; *Lindsay* v. *King, supra,* 138 Cal.App.2d 333, 342.)

The question whether the structures on adjacent property, visible from the land she proposed to purchase, were such as to charge appellant with constructive notice of the existence of the pipeline running under her property was a question of fact for the trial court. (See 17 Cal.Jur.2d 126, § 22.)

The judgment is affirmed.

Fox, P. J., and Ashburn, J., concurred.